My name is Susan E. Hill and I represent the Petitioners, the Morozov family. The family is here before this court based on two issues that arose during their asylum application. The first issue, I think, is more of a minor issue. It relates to application of the one-year bar to prevent that. Excuse me. The petitioner is Oleg Morozov, not the family. The family are derivatives of the asylum application, yes. The wife and the daughter. Correct. The wife and the daughter is 18 now, I believe. She was a minor at the time. Well, for immigration purposes, she's still a minor. The second issue related to credibility, adverse credibility specifically. The adverse credibility finding came about in large part due to allegedly fraudulent documents that had been submitted on Morozov's behalf, specifically a birth authentication for Mr. Morozov and for his father to establish that he was of Jewish ethnicity or religion. His claim stated that his Jewish ethnicity or nationality was what he was persecuted on account of. The investigation that the government conducted was an overseas investigation to determine the validity of the documents, and that investigation came back negative, stating that the documents were fraudulent. The investigation occurred over the Morozov's objection. They initially stated that it would be a violation of their due process rights. It was conducted against their wishes, and they specifically feared that it would place them in danger if they had to return to Russia one day, as well as placing in danger Mr. Morozov's remaining family that was still left behind in Russia. The Department of Homeland Security sent the documents overseas, and the investigation was conducted. The report came back, and it was admitted into evidence, again, over the Morozov's objection. The preparer of the documents that there were actually three overseas investigations that were conducted, one related to the nature of the business that had helped the Morozovs obtain these allegedly fraudulent documents, the second investigation related to the actual fraudulent nature of the documents themselves, and the third report related to the fact that basically the Department of Homeland Security and the Department of State stated that birth recordings from Russia could not be relied upon and that the examiners should question their validity. The main troubling document is the second one, the one that stated that the birth verifications were fraudulent, which proved that Mr. Morozov was of Jewish ethnicity. Mr. Morozov has always maintained that he had a Jewish ethnicity, and his credibility on that issue, his testimony was never questioned by the judge. The only thing that called into question his credibility were these documents. No, that's not quite right. There was a contradictory statement by Mr. Morozov saying that on his application, he said that he had reported the attack on him by the ultra-nationalist group NRU, and then when he testified, he testified that he never considered making such a report. A report regarding a non-governmental persecuting entity is important to judge whether the government is taking adequate steps to control it and whether the non-governmental persecution is valid. He testified inconsistently as to whether he reported the attack to the militia, which were the Russian police at the time. That is a basis that goes to the heart of the matter and is a contradictory statement, which the IJ and the BIA can take into consideration in evaluating adverse credibility. I understand, Your Honor, that I misspoke on that regarding his Jewish ethnicity. His testimony was not called into question, but I do agree that the judge and the BIA did raise that issue. As addressed in the brief, it is argued that the issue is not a major issue that goes to the heart of the claim. Whether he reported an attack, he bases his persecution, his asylum claim, on the idea that there's this uncontrollable group in Russia that beat him, and if he goes back to Russia, they'll beat him again. Whether he was beaten and whether he reported that to the authorities goes to the very heart of the matter, doesn't it? For purposes of that issue, I will go with that premise for now. What the Morozov's believe is more important is that he never did contradict himself. In his written statement, he indicated that he made the report. When he was questioned in testimony, the question he stated, more to his state of mind, did you want to make a report? And he maintained consistently, no, he did not want to make a report. There are actually two reports. His testimony was he never considered making a report. Correct. He did not. Would a reasonable trier of fact have heard, I never considered making a report, be justified in thinking that therefore he didn't make a report? He stated he never considered making a report, however... And that he never testified that he did make a report. He did not state that he made a report, however, in clarifying testimony, it was revealed that first, the hospital was the one who called in members of the police to speak with him. Second, his wife was the one who took him to the police station. I think it was a few days after the attack. Excuse me. And had him, he did not even himself make the report. She spoke for him. She provided the information. He said he was too ill to speak, and he sat there basically silently while she was the one that filed the report on his behalf. So the testimony is not inconsistent. He did not want to make the report. What he stated, he didn't think it would be worth his time, because he thought that the government and the RMU were cooperating or otherwise the government would not do anything to assist him in this matter. That testimony is inconsistent with his written statement that he did report it to the police. Right. He thought it was important enough to put in his application for asylum. Right, he wrote it in his application for asylum. And then this other version, is it your position that immigration judges should accept that second version as a matter of law? It's a clarification, Your Honor. I don't believe it is a different version. In his statement, which was prepared by another party, he does not speak English, and this court has recognized that in those circumstances, especially for pro se applicants, that the statements may not always be as detailed and precise as a fact finder would. Who prepared the application? It was simply a friend, or I don't even know if he was a friend. It was a non-attorney, a non-professional whom he trusted that filled it out for him. Given the fact that he did not speak English, it was translated from another language apparently, the use of a pronoun, I don't believe in this case, should affect his credibility to the extent that it is being impaired at this point. He did maintain consistently that his wife was the one who took him to the police report, and she provided the information. It was the hospital that called the police. Correct, the hospital called the police. He did not ask for the police to be called. What is the evidence that he was beaten up? The evidence are medical documents in the record. The credibility of those documents were never questioned, and the judge never questioned them, nor did the judge. I'm just asking, what's the evidence? Just tell us. You know, you seem to have a little, you know, give us more deep, the facts. You didn't give us generalities. Well, under, as I know this court is well aware, because this is a pre-real ID act case, that Mr. Morozov's detailed and consistent testimony may support his claim, and I do believe that he testified in great detail about the beating. The judge did not question those details. The medical document in the record indicates that he had been attacked, and that it was a racially motivated attack. Granted, that information had to have come from Mr. Morozov himself, but at the time the document was created, that was the case. Where was he beaten up? He was beaten up in, I cannot pronounce the name of the city, but it is a suburb of Moscow in front of his mother's apartment. And what happened when he was beaten up? I see that my time. Just answer my question. Sorry, Your Honor. Quit looking around. What time was he beaten up, Your Honor, you said? I don't know. What happened when he was beaten up? Did you slap him in the face and call him a bad boy? No, no, no. It was a severe beating. He was extremely traumatized as a result of this beating. He was taken by surprise. It happened from behind. He lost consciousness. He had cracked ribs. He was stewing up blood. He was admitted to the hospital for, I believe, two days afterwards. It was a significant beating that... What did they say to him when they beat him up? That he had harmed a Jewish boy, and they made several racial slurs against him. He provided ample detail on that regard. That Mirozov had harmed Jewish boys? The persecutors accused him of harming a Russian boy. I'm sorry, did I say Jewish boy? So what did they say to him? They called him racial epithets. What? They called him, in the record, it said a tyke, K-I-T-E. But I believe they meant tyke, K-I-K-E. Or the Russian equivalent. Presumably they were speaking in Russian, so we're all guessing. Perhaps, yes. What was the question? What did he say? Perhaps he spoke Russian? I said that. We're all approximating, so it came out in the record as tyke. It's probably what we call tyke. Correct, correct. What else did they call him? They called him, I believe, a dirty Jew. They specifically referenced his Jewish nationality, religion, ethnicity, whatever it may be called in this case. And the IJ found that he was not credible on his testimony about the fact that he was Jewish. The judge never made a finding specifically. She simply said, I do not find him credible, and then went into the fact that his documentations were fraudulent. Apparently he got a letter from the president of a temple in Hollywood. Correct. Who said that he's a regular member there and all of that. Have you got that letter? Yes, yes. Since he entered the United States, he began attending the temple. Read the letter to me. Yes, Your Honor. If you give me just a moment to find this in the record. I've got two numbers, either 9 or 755. I've got one with lots of zeros and then a 9, and one that's three zeros and a 755. The letter states, it is with great pleasure that I give you a little background on one of our members of Hollywood Temple, Beth L. Oleg Morozov. Mr. Morozov has volunteered for our temple since January 1999. He is an extremely hard worker and shows great pride in all the work he does. He regularly attends our Saturday services as well as our daily services. Besides Oleg's outstanding work habits and ethics, his character as a human being is unmatched by any. His outstanding character as one of the United States would be greatly proud to have in any citizen. Sincerely, Dr. Sanford Guam, President. And where is that temple? It is in Hollywood. What's the name of it? Hollywood Temple, Beth L. Now, didn't the IJ conclude that Morozov had failed to establish that he was Jewish? That he provided an inconsistent testimony about whether he reported the attack on him? That's another matter we've talked about. Didn't she conclude that he had failed to establish that he was Jewish? The judge specifically stated with regard to whether he was Jewish. What was her conclusion? She said he is not Jewish. Let me look at her specific findings on page 89. But I do recall that she did not address his Jewish ethnicity aside from the fraudulent documents. She starts, in this case, it's under a heading titled findings related to respondent's claim of being Jewish. In this case, respondent submitted a birth registration certificate for himself that was determined to be fraudulent by the Department of Homeland Security. The birth registration certificate is one of three main documents that supports the heart of a male respondent's claim. Where did he get that birth certificate? The birth certificate came from an entity called Argument that was facilitated by a man named Michael Sarkisov. And they were hired to obtain the document for Mr. Morozov because their family had had trouble getting documentation themselves from Russia. So he hired a service. Yes. And they produced the document. Yes. It had a double eagle on it. Yes. And our people concluded that it was not a genuine document. Correct. And this is something that happens quite often in other people, in other countries that want to verify. And they're told to go to a certain place, and they hire these people, and they get back these documents, which we say are not authentic. Correct. So it's not, he's not the only one. No. Who's through all this. And government counsel on cross-examination intimated that Mr. Sarkisov was under investigation in several asylum cases for similar misconduct. And there's also the issue of... Wait, there's several other asylum cases? Yes, Your Honor. Not his. Right, right. Somebody else's. Correct, correct. And there's also the issue that I briefed as well, whether the Russian government had motive to deny the authenticity of these documents once they perhaps realized that it could be related to an asylum claim in the United States on the basis of Mr. Morozov's Jewish ethnicity. Right. She also found that the certificate, the marriage certificate and certificate of establishment of fatherhood sets forth that the responders are Jewish. I'm sorry. Never mind. You've asked my question. Okay. You've pointed me to the right person. Just one thing on the subject that you didn't get a chance to get to, and that is the one-year bar. And in particular, the argument, as I understand it from your brief, is that it's because of the illness and condition he was left in after suffering what he suffered in Russia. He came to this country and was still unable to do anything. And the brief says he did everything he could to try to fill out the application. Later, your brief relates or speaks of his reliance upon his wife, in particular in connection with the police report. Why didn't his wife do what was necessary to prepare the asylum application? There was no testimony taken on the issue why his wife did not undertake the burden. She may have been briefed the question about it, and she may have said it was his story and his details, which is correct. She was not there personally to provide all of the details. But apparently she's the one that made the police report. He was unable to do it, didn't want to do it. She did it anyway. Right. So I sit there and wonder, well, then why doesn't she do an asylum application, particularly since she's dependent upon that asylum application for her own status? That could, as I think third-party observers who are not in the heat of the situation, we can make that judgment. But as unrepresented persons at the time who did not know the laws and who apparently greatly respected this country's laws and wanted to do it correctly by having someone help them out, then there's no indication that Mrs. Morozov understood what would be sufficient for an application and what wouldn't. She was not comfortable with her English skills to fill out the application. In Russia, she did the police report in the Russian language. There's also a language barrier. And finally, she is not the principal. She could not sign the application. Mr. Morozov had to verify under, as the language on the signature pages state, excuse me, there's language as far as affirming and certifying the veracity of the statements contained therein. So if she had filed it, he still would have had to review the accuracy of its contents, and he was not capable of addressing these issues because he clearly suffered from debilitating symptoms that lingered after the severity of the attack. Wasn't he in a state of deep depression? I understood. Yes, he was. He didn't, except on a few occasions, he didn't do any work. He got a job as a dishwasher, and they fired him. Correct. To this day, he's still unable to work. And there's something in the record that he was doing housekeeping, but that was incorrect. It was his wife that was doing the housekeeping. Right, it was his wife. And did he apply for a visa extension within the one-year period? An application was submitted for a visa extension. There's no testimony as to who perfected that application. But again, that doesn't have anything to do with his persecution claim. It has to do with the fact that he was under exceptional circumstances, which excuse the one-year bar. It does, but his excuse that he could not file on time was because he could not address the claim, and due to his lingering depression and trauma, he could not verify the accuracy of any details. Wasn't there something in there about the fact that whenever this whole incident came up, it just threw him into a cause of a lot of anxiety and all that? Yes, he could barely leave the house initially when he arrived in the U.S. Thank you, Your Honor. May I have a minute for a bottle, if necessary? Sure. Thank you. May it please the Court, Rebecca Hoffberg on behalf of the United States Attorney General. The Court has already recognized the two issues in this case, the timeliness of the asylum application and the adverse credibility finding. I'll pick up where she left off in terms of the untimeliness issue. The government's position is that this Court lacks jurisdiction. In a way, a worthy counsel. Yes. The government's position is that the Court lacks jurisdiction over this determination because in this case, it's a factual question in terms of the extent and degree to which the alleged illness impaired his ability to file for asylum. Your Honor, it's already pointed out some of the reasons that were given by the agency in this case that cast doubt on whether what he was suffering was so debilitating that he was unable to actually apply for asylum. The fact that he was able to get California driver's licenses and renew his California identification card, as well as seek benefits. This is on page 425. Seek benefits. Extend his immigration status here. And this is on page 404 to 407 and 425 to 426 in the record. And you can see that the dates on these events occurred during 1999, which is allegedly perhaps maybe, you know, when he had just gotten here, the year that he would have been looking to file for asylum, and yet he's filing for other benefits. I know that counsel just testified that he may not have been the one to perfect these things, but there's no evidence in the record to support that. How can somebody else get his driver's license? Well, he needs to be the one to get his driver's license. You have to sign for your driver's license. And have your photograph taken. Yes. And you can see from the record, as I mentioned, page 425 and 426, that's where you can see those identification cards. But regardless, see, this is why this is a factual dispute, because to dispute how ill he was or if he wasn't or what the effect of his illness was, these are all factual questions. And this court will only review when the facts are understood. You're saying a person in deep depression is capable of getting a driver's license. What the immigration judge found is that the illness was not so debilitating that he was not able to do other things. Getting employment was one thing, regardless of the fact that maybe it wasn't. Really, to do almost anything, to be part of the community, you need a driver's license. Right? Indicating his willingness or desire to be part of the community and not necessarily as debilitated as he might have alleged. Oh, sure, sure. But he gets a driver's license, okay? And he says he's a very—his testimony is a very sick man. He's depressed. He's debilitated. He can't get out of bed. He doesn't have a lawyer, does he? He was working with someone that they had hired initially to try to talk to her. The thing is, he never explains why he all of a sudden overcame his illness that he was able to talk to someone. The only thing that he says is that he eventually met someone he could talk to. Presumably, as this court has talked about, talking to his wife, of course, you know, if he felt comfortable enough to talk to anyone. Well, people recover. It takes time. People recover from depression. Depression is a very common illness. Yes, but the evidence doesn't suggest that something all of a sudden changed with respect to his depression in May 2001 that he was all— We don't, you know, we didn't take him day by day by day in his testimony, so it changed. This is why it's mostly a factual question here, because things are constantly changing in terms of medical illnesses, as you mentioned, and the degree of it, and how it affected his ability to do other things. These are factual issues. And that's why under Ramadan, and that's why the government submits, is that this court may not review the extent of those factual disputes, because— No, no, we—as far as the facts are concerned, they're determined by the trier effect, but when the conclusion to be drawn from those facts, I think we have cases that have held that, you know, given the facts that are not contested, that this court can draw a conclusion from those facts. Uncontested facts, yes. Yes, that's what I'm saying. Yes. Yes, Your Honor. In this case, it's disputed the degree of his illness, and so the fact that the immigration— for example, he was trying to claim that he had PTSD, and the record doesn't actually support any diagnosis of that. It's called sephalgia, I think is what they called it. And there's different—what he interprets as his illness is different than what the medical documentation states. And as far as reviewing those medical records and determining the degree of the illness, those are factual questions, and whether they were so—he was so debilitated. You know, you don't think someone who is beaten up like that, that doesn't suffer from PTSD, post-traumatic stress disorder, one incident, one terrible incident, can't produce that in a person. It very well could. It very well could, Your Honor. I know a lot about that subject. Sure it can. There's no doubt about it. So why does our government want to beat up on this person? Well, Your Honor, his actual claim and what happened, I'm about to get into that, but there's actually—there's doubt on the whole incident and about his whole claim for asylum that I want to get into. The government is not necessarily trying to beat up on that in any means, just merely pointing out that it's a factual question for the immigration judge to look at, and that this court has found that it cannot review. But I'm going to get to the adverse credibility portion now. There isn't a single reliable document in the record to show that he was Jewish. Ralph, let me stop you there. That's one of the things that really troubles me about the findings here, because you can all read the same letter, and if I've got a letter from a temple that says he's a member, why am I supposed to conclude that's not evidence that he's Jewish? Okay. First of all, that letter does not say anything about him being Jewish. It says he goes to a temple. One of our members of Hollywood Temple Beth-El. I'm a member of a church, and I think it's a reasonable inference. I'm an adherent to that faith. He's described as one of our members. On page 511 in the record in his written asylum application, he wrote his religion was none. Well, you could make a case perhaps that he's inconsistent, and that's the basis for claiming an adverse credibility determination, but that's not, in fact, what I read from the IJ. The IJ said there's no evidence that he's Jewish. I thought you just said there was no evidence that he's Jewish, and I'm staring at a letter that says he's a member of a temple in Hollywood. Why can't I infer from that letter that that's evidence that he's Jewish? Because, Your Honor, people can actually be members of organizations without adhering to the particular faith. You didn't say maybe he's not a faithful Jew. You said he wasn't Jewish. There wasn't evidence that he's Jewish. And I look at this, and I call this evidence that he's Jewish. Well, the evidence was obtained after he was already here, and so if, in fact, he became... How is he going to get along? You know something? He's from Russia, right? They don't like Jews in Russia. Is that right? Come on. You know that. And they don't like religion in Russia. So they suppressed all of this. So a lot of people, you know, sort of gave up on religion. Right? They didn't talk about it. They didn't want to talk about it. They didn't want to get in trouble. They didn't want to have problems. That's true, isn't it? That may be true. What do you mean it may be true? Some people may... You know it's true. Our State Department knows it's true. You mean our Department of Justice doesn't know something like that's true? You don't correct your honor about the State Department. Yeah. Okay. I'm sure. So a lot of people in there, they'll come and they'll say, you know, what's that question? What's the religion? Is that what they said? Yes. They said no. You can be Jewish without having a religion. You don't need a religion to be Jewish, do you? From the perspective that you look at it as a nationality or ethnicity, I understand... You know, there are Jewish people that believe in a lot of things. Yes. Some are agnostics, right? You know what an agnostic is? Yes. Yeah. And others are very religious. Yes. You know, they go and they spend a lot of time praying. So that's the way it works. So if he says, what's your religion? None. You know, maybe he's a Unitarian, but he's still a Jew. And that's what they thought he was when they beat him up over there in the streets. This is what he alleges. He put his Jewish identity at issue when he submitted the documents that he did. What documents? The documents that he submitted. Well, there's several documents in the record. I think it is worth... I see that my time is running out, but I'd like to answer your question. Basically, the documents... Most notably, the documents that he obtained, original documents, and that are all dated from before he left Russia, none of them indicate that he is Jewish. No, they don't want that on their documents. Why would he want to have that in there? Well, he claims that everybody knew that he was Jewish by going into the records of the building. This is on... Well, they know who's who and what's what. Page 234. They don't put it down. Well, the fact is he claims it was so easy to find out that he was Jewish. And that is his claim, that it was easy for his persecutors... But what about his name? He's got a Jewish name. Well, you could have a... I'm just saying you could have a potentially Jewish father and not a Jewish mother, and you could take the father's name and the mother's not Jewish, and you're talking about Jews. He does have a Jewish name. I don't know. Well, I know it. I looked it up. There's a good book. You can look these things up. Your Honor, the fact is that... It's called Jewish Surnames in Tsarist Russia. Let that sit. I have to admit I'm not familiar with the book, but if his name was in fact Jewish, that's not really the issue. He put documents that called it into question. By placing these documents into evidence that were found to be fraudulent documents, and that from an organization that the U.S. government found not to even exist, put that all into question. A lot of people are using that organization. We just heard that from you. That there's widespread fraud going on. Yes. Yes. We know there's widespread fraud going on with the notorials in this city, right? Yes. Yes, Your Honor. And the Justice Department doesn't do anything about it, does it? Well, I'm not sure... Well, what have they done? They've done nothing. No, period. You know that. You know that. So, if you don't, you can talk to Juan Osuna in the Justice Department. You know him? Yes, Your Honor. Okay, talk to Juan. In this case, the problem is that the documents... and a perfect example is his daughter, Ledmilla, from a previous marriage. He submitted an original birth certificate that indicates his nationality is Russian, and then submitted a birth confirmation that now says his ethnicity is Jewish. The difference is the birth certificate is from many years ago, and he only recently got this birth confirmation. He said his wife's sister obtained it from the government, which I want to add the fact that they were contacting the government in Russia. His nationality is Russian. Yes, Your Honor. He's a Russian. He is Russian, yes. But what's noticeably different is that when they write nationality, they didn't bother to write an ethnic nationality on the one birth certificate, and then when he recently asked for a birth confirmation, now it says Jewish on it, on that one. And none of the other documents that he... He didn't write that, did he? This outfit and wherever it was that other people used, wrote this. He didn't write this. It's not his handwriting. He didn't write it. This is true. But he was the one to obtain the documents from Michael Sarasoff and the Argument Bureau. It was him that obtained many of the documents, although not Lyudmila's certificate. That was from his mother's sister asking the government, certain government bodies, as you put it. And I want to just bring that in really quick because the government was being contacted by him, and therefore it could not have been some sort of breach of confidentiality for any reason for the government, for the U.S. government to do the same thing that he was doing in terms of contacting the government to ask for some birth records. The other thing I want to point out about that is that birth records are in no way indicative of asylum claims. The confidentiality came up in the previous case, so I thought that I would mention in this case it's not any concern. I missed your reference to Lyudmila's birth certificate. What evidence is there in Lyudmila's birth certificate that Oleg Morozov is not Jewish? On her original birth certificate? It just says his nationality is Russian, and her birth confirmation says his ethnic nationality is Jewish. So this is a clear change from what was presented on the birth certificate and what is presented on a birth confirmation. One is ethnic and the other is nationality? Yes, but why wouldn't it appear? His ethnic nationality has always been Jewish, supposedly. So why would he not have it appear on her birth certificate and have it appear on her birth reconfirmation? The point is that it was a combination of factors in this case. And I think that's what I wanted to bring up, the case Yemane-Behr, I think that's how you pronounce it, where one fraudulent document that went to the heart of the claim. Well, you know, when the doctors get made out these birth certificates, I'd like to show you mine, how they cross this out and that out. You know, right here. So, you know, they scribble stuff on there. Here it is. Nobody paid that much attention to even many instances of keeping records of kids, particularly women. They didn't bother even to write that down. At least she's got a birth certificate. Well, and he was able to obtain, his wife had her birth certificate. He had Lenella's. He failed to produce the birth certificate of his other daughter from his previous marriage, who was, you know, that could have just as easily been. The problem is that he didn't actually produce any original, reliable documentation. Every piece of documentation that indicated something about his Jewish identity was questioned. How was he supposed to get it? Go over there and ask for it himself? Well, what he did was he tried to, well, he said that he had people making inquiries. Did he use the service? Yes. And the service was found to be non-existent. And not only that, but the man working in the service has been found, as you mentioned, in lots of other asylum applications. That may not be his fault. That leads to the question, at what point did Petitioner become aware of the unfavorable investigation report casting doubt on the credibility of the documents that he'd submitted through this bureau? And was there time between that date, and did he learn about it at the hearing so he couldn't do anything else about it, or did he learn about it sometime in advance so that he had an opportunity to try to find something else? Yes. No, they knew about it. There were several hearings in this case, and it was constantly continued. And the documents were submitted early on. And actually, I want to just point out very quickly that it wasn't that the immigration judge asked him for corroboration despite having consistent testimony. He submitted these documents in evidence up front, and initially, calling into question his own credibility, he put that at issue by submitting these documents. And as we've discussed, his testimony was not consistent or credible otherwise. But he did have the opportunity because he knew that the consular investigation was going on and that this was something that was being considered against him. And he was confronted also in his testimony, this is on page 278 and 279 and 280, where he's asked about what he knows about Michael Sarasoff and the Argument Organization. And the interesting part, if you look at this testimony, is he never actually says, I didn't know it was fraudulent. He tried to distance himself from his involvement with Michael and the argument that he got it from. He said, Well, the answer to Judge Clipson's question is at page 90 of the record. Upon learning that the birth certificates presented before the court were questionable, the respondent admitted that he did not try to obtain other documents or ask anyone for documents establishing he was Jewish. I didn't hear the last page. I'm sorry. I was saying that upon learning that the birth certificates presented before the court were questionable, the respondent, that is Morozov, admitted that he did not try to obtain other documents or ask anyone for documents establishing he was Jewish. This is an answer to Judge Clipson's question. Yeah, but how would he have gone about that? Does our consulate in wherever it is, Moscow, different places, if you're applying for asylum from Russia, and you need some documents or they'd be helpful, can we call the consulate and ask them to go get it for us, to look for it, to help us out? We can do that, can't we? The guidelines are in something called the Cooper Memo. Forget about the guidelines. Do we do that? Yes, we can contact the foreign government about documents, absolutely. And how would an applicant know that? That we're allowed to contact his government? Yeah, just say you've been notified that, you know, dear applicant, if you need documents, it may be in some foreign registry or office, just call us and we'll send somebody out and see if we can find them for you. We want to help you out. That our government would do that? Yeah. Whose government do you think I'm talking about? Well, no, you're saying that our government would go and obtain documentation for an asylum applicant to help him meet his burden of proof for asylum? Yeah. That's his burden. The government, as you mentioned in the previous case, has the burden of showing removability. So we don't do it. The applicant has the burden of proof. So we don't do it. That's correct. We check with the government to verify the authenticity and check for fraudulent documentation. If we don't do it. We would put the applicant at risk if we did. I mean, that's the point, right? Well, the applicant would ask. The applicant would ask. Please, Mr. Counsel General, or whatever it is, go to Baronovitchi and find out, get me my grandfather's birth certificate. I need it to show my ethnicity or whatever. He never asked for any of the government's help. But you say we don't do that. Well, no one has asked that I've seen. I haven't seen a record where someone has asked our government to assist in obtaining documentation. It is always that they have gone about obtaining the documentation. My circuit is a public service organization. We make things easy for people. We help them out. We've got all kinds of stuff. But our government doesn't do that. They say, okay, you want to, you go. What do they think, people are going to get in a plane and fly over there? They're going to hire one of these services. So we're creating those business opportunities for those crooks that are out there probably. There were other opportunities in the record for him to show something about his Jewish identity. For example, he submitted a letter from his neighbor who apparently knew him for decades and didn't mention anything about his Jewish identity. Maybe he doesn't want his neighbor to know. Maybe he doesn't want his neighbor to know. He never said that. Well, it's a reasonable inference. He didn't want his neighbor to know. The standard of review is whether the evidence compels a contrary conclusion to that reached by the agency in this case. You may disagree with what the agency found. The standard is whether you would be compelled to find otherwise. In this case, the agency listed several reasons distinguishing this case from cases like Korsky and Yemane Bear, where courts have found that it wasn't enough fraudulent information to sustain the average credibility finding. And this case is materially distinguishable from those cases. I know I've gone over. It's not your volition. It got you over time. We've managed to abuse both sides here. We're equal opportunity. Thank you. Just briefly, Your Honors, Petitioner's opening brief, pages three through five, indicate the efforts that Mr. Morozov and his family went through to try to get documentation to support that he was Jewish. Additionally, he testified that his appearance was enough to clue in his persecutors that he was Jewish. Finally, the fact of whether his family members inquire on the documents or not is far different from the U.S. government. Making an inquiry on the authenticity of the birth certificate has been recognized in case law and briefed on by the petitioners as far as that. But I just wanted to underscore that a relative going, a Russian relative going to the Russian government and asking for a copy of the document is a different matter than the U.S. government making an inquiry as to authenticity on a document that purports to indicate that the applicant is Jewish. If there are no questions. Well, since this is December the 7th, it's another day of infamy that I forgot to point out. And that is that I was first appointed to the federal bench on December the 7th, 1967. Forty-three years ago. The flag is still flying. I do that every December 7th. I do that every December 7th. Good morning, and may it please the court, my name is Howard Holland on behalf of the petitioner Mr. Jim Fang. When I was first contacted by the petitioner's son, who is present in the room today, I said to the son, your father's case is not going to be a simple adjustment of status case because of the involvement by Chinese government agents. What I did not expect was that our executive branch of government would comport itself in a manner more befitting that of a totalitarian regime. First, the U.S. CIA denied Mr. Fang's adjustment of status based upon a decision that was made by the U.S. CIA in the August Interpol report by the Chinese government agents. The Chinese government agents reported that Mr. Fang had been convicted of a crime. That was not true, as the immigration judge found out when the removal proceedings commenced early on in the case. The decision denying adjustment by the CIA was contrary to established procedures and regulations. As part of an adjustment of status application, certain forms are submitted, and one of those forms, the biographical data form, is sent routinely to the American embassies and consulates abroad for our government to obtain any information that might be out there relating to a particular applicant for adjustment of status. The record doesn't show that that had been done. If it had been done, there's nothing adverse. At least one can believe that. There was nothing in the judicial system of the Chinese government that said Mr. Fang had been convicted of the crime reported by the agents to Interpol, which led to his denial of adjustment of status and subsequent detention during the whole immigration court removal proceedings. Further, the immigration judge, in the name of protecting the confidentiality of Mr. Fang's request for protection under the Convention Against Torture, bifurcated the renewal of Mr. Fang's adjustment of status application from his TAT application, which is ordinarily a good thing. We certainly don't want the communist agents testifying to be aware of the other part of the case. They're testifying just on whether or not there is a conviction that exists. But then strange things began to happen. After taking testimony from the two communist agents and the alleged co-conspirator, who was promised a reduced sentence if he behaved in a good manner, the immigration judge found that the- No, no, no. He had added, not so. Mr. Guo had his sentence reduced before he testified. That's correct. We don't know exactly when that reduction might have been. Well, the reduction took place before 2000, wasn't it? Yes, Your Honor. The immigration judge, after taking testimony, found that the petitioner may have been involved in criminal activity and thus denied the petitioner's adjustment of status in the exercise of her discretion. If this was the end of the matter, that would be well and good, and we would not be here challenging the exercise of discretion. But what happened three months after the immigration judge denied the adjustment of status, the immigration judge took testimony on the TAT claim, took testimony from the petitioner's expert witness on the Chinese communist judicial system or police system, and also took into account the State Department's country reports, and the immigration judge came to the conclusion that those two communist police agents were not trustworthy and should not be believed, and therefore did believe that Mr. Fang would be subject to torture if he were returned to China and subjected to criminal prosecution. The IJA found that the people who testified in the asylum hearing, in the adjustment of the hearing. Correct. The adjustment portion occurred by the same immigration judge. There was an inspector. Han was one of them. That's correct, Your Honor. And she made a finding that they were not credible in the count? Yes, she said they were not trustworthy because... Where was it? Can you give me the citation? Read it to us if you've got it. Well, I don't have that, but if I could refer to, Your Honors, to the administrative record at 237, and also 974, and also back to 235, Your Honors. That's where the immigration judge discussed the testimony of the... Well, that's a big deal that you don't have a transcript. Well, my assistant, I think, will get that for you, Your Honor. So I'm looking at 237, which is part of the IJA's decision. And I really don't read that to say that the IJA found the Chinese police officials incredible. The skepticism has to do with the insistence that if he returns to China, they will be fair and procedurally unbiased toward defendants. It goes on to say the State Department reports the report of the rapporteur and Dr. Rosen corroboratively show otherwise. So I don't know if it's the same thing as to say that, look, he's not going to get treated fairly because the Chinese criminal system doesn't work the way that we think it ought to or we think is fair. But that doesn't say that we think these guys have been lying through their teeth and can't be believed. Well, two places. Number one, as I said earlier, the Interpol report was not truthful, which was put in by the Chinese agent. Secondly, the first agent testified or one of the agents testified that Mr. Fang was guilty and that he made the determination of guilt and that all the judge would have to do was to impose sentence. I suspect most policemen in the United States, after arresting and charging somebody, would testify that, yeah, I got the guy that was guilty. Well, that may be true, but this should not... And neither of those things represents a finding by the IJ that those witnesses are not credible, which is the statement of yours that I'm focusing on. They're not to be believed because they've made so many inconsistent statements. And the IJ said that someplace, and I'm still looking to see where the IJ said that. That may be your conclusion, but, Mr. Hom, you told us a moment ago that it wasn't your conclusion. You represented that was a statement by the immigration judge. Now, we've been through 237. The other two citations you gave us was 235 and 974. I have in my notes, Your Honor. All right. Go on to something else. Well, also, Your Honor, on 237, the bottom half, all the officers Chen, Han, and Song Wei have made descriptions of the criminal justice system in China, which they claim to be fair and procedurally unbiased towards defendants. The State Department reports... Well, that's what I just read to you. And I'm still looking in that paragraph for anything that represents a finding by the IJ that they're not credible. Let me fast-forward to the BIA decision. The BIA decision specifically states that the Board of Immigration refused decision dependent to the petitioner's opening brief, the August 30, 2007 decision. So that's page 2. It starts on page 2. All right. All right. The BIA decision... Of August 30, 2007, at page 2 and 3. Your Honor, I'm looking at probably a thing or two. The petitioner's opening brief. That's not... That's not at page 5. All right. Page 5 of the administrative record, page 4 of the BIA decision. On the very bottom, the testimony of the August 30, 2007 decision. That's what I'm looking at. Page 5. Of the administrative record, page 5, page 4 of the BIA decision. On the very bottom, the BIA points out the testimony... Very bottom of what? I'm sorry, Your Honor? Very bottom of what? Of page... Administrative record, page 5, page 4 of the BIA decision. The testimony of Guo Zhang, the response alleged co-conservative, which was taken in the presence of Chinese prison officials who were detaining Guo, is more suspect. Yes, but that's Guo. Guo. Take a look above that. First, in the paragraph above that. First, the Chinese officials who testified. That's the ones you were saying were later found to be not credible. The Chinese officials who testified in the respondent's case did not have the same incentives to provide false information as the officials in Lin. Skipping a couple of sentences. In the present case, however, the U.S. was inquiring about a criminal investigation. Criminal investigations are legitimate government activities. Accordingly, the Chinese officials had much less incentive to give false information, particularly as to the actual criminal prosecution of the respondent had not yet occurred. Now, that is certainly not a finding by the BIA that the Chinese officials who testified were lying. Just the opposite. With all due respect, Your Honor, the immigration judge did find that in the cap portion of the hearing that the Chinese officials would do anything to have the petitioner sent back to China subjected to sale and tortures. And he granted his cap. Correct. So, yes, they can be horrible people who can torture the man, but that doesn't necessarily mean that when they testified he found them to be incredible. But the agents testified that Mr. Feng would be given a fair hearing with a judge, but that wasn't the case. The judge found just the opposite. All right. And that's why he gave him a cap. Correct. I think we've exhausted the subject. Will Your Honor, if I may reserve the balance of my one minute left? Sure. You had a minus number on your account. Mine was a minus? I'm sorry. No, no. It's right here. I'm just looking at my watch. I don't know. I want to depending on this year minus accounts aren't too important. They have placed the court. My name is Emily. I'm here today on behalf of the attorney general. And the record is very lengthy. I brought it with me on this. My memory tells me the page numbers that you might be looking for. I apologize for not bringing it with me. This case involves a Chinese businessman who freely traveled between the United States and China for a number of years who was placed in removal proceedings when he became involved in or charges were lodged against him indicating that he had been involved in criminal activity in China. While the proceedings below were lengthy and were complicated and involved any number of witnesses, the issue before the court today is straightforward. The first petition for review in case number 0770306 should be dismissed. There is no case or controversy or no issue for the court to decide. The attorney general granted Mr. That's the cat decision, right? Pardon? The number used for your law. That's the cat decision which was favored for the petition. That's the first petition for review. The board granted Mr. Fang protection under the Convention Against Torture. That's not being disputed today. The Department of Homeland Security did not certify the decision to the attorney general for review. And Mr. Fang himself did not appeal or cross-appeal the immigration judge's decision. So the court, in fact, wouldn't have jurisdiction to review that first order. What the board did do was grant Mr. Fang's motion for reconsideration and address the arguments that he made in which he challenged the immigration judge's decision. Denying his application for adjustment of status and the exercise of discretion. That is not an issue that this court has jurisdiction to review, as it has held in numerous cases under Section 1252A2B2. Two little I's. The court does have jurisdiction after Real ID. It's very clear to review a colorable due process claim or a legal question. Why isn't a colorable due process claim for the petitioner's claim that Guo's testimony was in jail and with his waters present was coerced? Was that a due process violation? That issue was raised, and I'm trying to answer your questions as directly as I possibly can. As far as Mr. Fang was concerned, he had an opportunity to hear the evidence that the government offered in opposition to his application for adjustment of status. He had the opportunity to address and to question, cross-examine the government's witnesses, and he was given every opportunity to present sufficient evidence on his own. So I would say, no, it was not a due process violation. The board did find that in the weighing of the evidence that Mr. Guo's testimony was that there had been sufficient evidence raised in the context of the hearing that there may be some question about his testimony, or that it should be given less weight because he would have been inclined, possibly inclined, to testify in a manner that pleased the Chinese prison officials. Was there sufficient evidence of Mr. Fang's involvement in the embezzlement, or claimed embezzlement in China, without Mr. Guo's testimony? The board found, even setting aside Mr. Guo's testimony because of the possible doubts about it, that the immigration judge did rely on other documents in the record. And what in the record, the two elements to this fraud, one is the taking of the money, but the other element is knowledge, actual or reputed, that the money was the government's money, it wasn't Mr. Guo's money. Mr. Fang could take the position, yes, I borrowed money from Guo, and yes, I invested in this country, and yes, some businesses went well, others didn't go so well, but I had no idea that Guo was stealing it from the government. Now, what evidence, other than Mr. Guo, who was serving a now-reduced 20-year term, and was testifying from jail with his warders present, was there that Fang knew that Guo's money came from the government, not from Guo's pocket? The immigration judge raised that issue at the January 25, 2006, Master Calendar hearing, and told both the government and Mr. Fang that she was having difficulty making those findings. In response, the Department of Homeland Security identified specific evidence in the record that it believes was sufficient to support its opposition to the granting, adjustment of status in the exercise of its powers. Let's talk about the facts. What evidence was there that Fang knew it was government money that was coming to him, other than Guo? There were bank records, there were land transactions, there was other documentary evidence and testimony of other witnesses that the immigration judge considered in making her fact-framing. What other witnesses? The Chinese policemen? No, the depositions that were in the course of the investigation, where she discusses in her decision, I believe, what other individuals… Give me the name of one witness who testified Fang knew the money was government money. At the immigration hearing? Yes. That testified at the immigration hearing? Mr. Fang said he didn't know. Mr. Guo said he did. It was the immigration judge's decision to… Let me rephrase my question. Okay. Eliminate Fang. Eliminate Guo from my question. Give me the name of one witness who testified that Fang knew it was government money. Because if Mr. Guo was not to be believed, or have his testimony severely questioned because he was in jail at the time he was testifying, I would like to know what other testimony there is that Fang knew was government money, and it wasn't Guo. Fang is not accused of defrauding Guo. There was another witness, and, Your Honor, I don't recall the name, and I'll be happy to submit that. There was another person who was deposed by the Chinese government who was involved in the land transactions that, I believe, identified Mr. Guo and Mr. Fang as having been involved in this transaction. I'll try to help you. Is that person identified by name in the IJ's decision? I believe that it is, Your Honor. Her decision starts at 198 of the record, and she discusses the evidence in some detail. She also discusses Mr. Fang's evidence. Mr. Fang was given the opportunity to proffer evidence of his own, and while perhaps much of what she was looking at or was confronted with was circumstantial evidence, he was given a chance to provide his own evidence to refute that. He submitted affidavits from four individuals, none of whom she found that they were not sufficient because they didn't establish how they could conclusively prove that there was no transaction or no wrongful transaction between Mr. Fang and Mr. Guo. None of those witnesses were called to testify on behalf of Mr. Fang. One of them, indeed, Ms. Rutherford, provided definitions to both the government and to China and an immigration court. Mr. Fang himself agreed with the immigration court to the January 25th hearing that he could testify to the conditions under which his evidence was given to the Chinese, and when he indicated that the son had been given money to bring to the United States. And he was neither called, and there was no explanation for his absence, no requests for continuance. This is not an unsophisticated businessman. His record establishes that he and his family had operated numerous businesses, that they conducted business internationally, shipping raw materials and goods. They had tax advisors. The fact that all he came to court with was his bare denial that he was involved or that he knew that Mr. Guo was involved when he could have presumably produced evidence showing that the transactions that are referenced in some of them in his own affidavits, that those were legitimate transactions that occurred through conventional means and bank transfers and so on. One of his affidavits, for example, acknowledges that he received large sums of money from Mr. Guo, which for a referral fee in depth. You read Mr. Guo's testimony and Mr. Fang's testimony. One says, I loaned him money, he didn't pay me back. The other says, no, I loaned him money and he didn't pay me back. It's clear from the record that there was a lot of involvement between the two of them. It was the immigration judge's job as the adjudicator to- Counsel, I'm not getting across to you. Mr. Guo and Mr. Fang are considered to be co-conspirators by the Chinese government. It's obvious, it's an old rule, a co-conspirator's statement has to be corroborated by something other than the co-conspirator's statement, especially when the co-conspirator is sitting in a Chinese jail and has a warder listening to what he's testifying to. I'm asking you, what corroboration is there in the record that Mr. Fang knew that the money was coming, not from Guo, but from state sources which Guo was stealing or embezzling? And you've given me, you said there's a deposition of a person cited in the IJ opinion. I haven't been able to find a deposition even mentioned. So, please help me out. I'm looking around as fast as I can. If you look at page 24 of the IJ's decision, there's a list of names. At one time I had those people identified, and I can't tell you- And their names, the spelling changes, the spelling and pronunciation changes in the evidence in the deposition. She speaks of the affidavit of Mr. Zhang Jian on page 22 of her decision affirming his familiarity with the land deal. Page 22? Yes, that he declared- I think- This is Mr. Zhang. He's the defendant, he's the respondent. No, middle of the page, affidavit of Mr- Oh, I see. He's familiar with the land deal between the respondent and Mr. Zhang, and he actually signed for the loan. Even conceding at this point- Mr. Zhang testified that he did this while he worked at the People's Bank of China. But where is there any testimony that the money came from government funds, Chinese government funds? The testimony that the money came from Chinese funds is Mr. Gao, whose testimony we're not giving full weight to, and from the other records that the Chinese government investigation- Which other records? The records of the land transactions, the bank records showing remittances, the other witnesses that they deposed in exhibits, what the immigration judge referred to as Exhibits 12A, B, and C. Exhibits? These three exhibits that were provided in 12A, 12B, and 12C. 12B and 12C. All right, thank you very much. Even if that evidence is circumstantial, it was sufficient or it was not improperly considered by the immigration judge or by the Board of Immigration Appeals in evaluating Mr. Zhang's eligibility for adjustment of status. That requires the Board to make a determination that it is in the interest of the United States to admit this individual as a lawful permanent resident. That fact-finding, that weighing of the evidence was conducted by the immigration judge and on appeal by the Board. Is it your position, and you can answer yes or no I think, is it your position that even if there is no evidence from which a rational person could conclude that Zhang knew the money came from government sources, the Attorney General has the discretion to deny adjustment of status in the interest of the United States? I am not making that argument. I think that there was evidence in this record. No, there was evidence in this record. At first you were going to tell me that there was a witness who gave a deposition that Zhang knew that this money came. You've given me the affidavit of Zhang's deposition. All right, that doesn't answer my question. Then you've given me exhibits 12A and 12B and 12C, which I will read. Is there anything else that you can point to as corroborating evidence of the co-conspirator Guo, whose testimony has been devalued by the BIA? There was the sufficiency also of Mr. Fang's own affidavits that he submitted into evidence. Fang said he knew that this money came from... No, Mr. Fang submitted affidavits from his own evidence and effort to respond to the government's evidence. The immigration judge found that... And she was not compelled to believe that he was innocent simply because he said so under this court's precedent. He submitted evidence that she examined and that she found that was insufficient to compel her to find that there was no involvement on his part at all. The records are lengthy and complex, and they establish that there was a great deal of financial and business and other transactions... There's no question of a great many transactions, but there is an intent element, which is that he knew the money was from the Chinese government and was embezzled by Guo. You have to show that. Now, you're not telling me that Fang's affidavits show that. No, I'm not saying that. I think we've got the idea. Okay, I'm saying that your question was whether if no reasonable person could find that there was involvement, that the Attorney General was still free to deny adjustment of status on the exercise of discretion. So that's not the case here. That's not the case here. I think your legal proposition is to answer that question, yes. You're saying the factual assumption you're not trying to assert. But, in fact, the exercise of discretion, as I read your brief, is one that the Attorney General is free to exercise as he sees fit. We don't have jurisdiction to review it. And I would not argue with that legal conclusion at all, Your Honor. But I would also not want to leave this Court suggesting that the immigration judge is going to make or, excuse me, the Attorney General is going to make an arbitrary or capricious decision that is not supported by the record. There was sufficient evidence in this record to support the exercise of discretion. And the fact-finding and the weighing of that evidence, whether there was sufficient circumstantial evidence, if you will, to support the denial of adjustment of status, that is a decision that was committed to the- Well, but we don't know what the circumstantial evidence is. The evidence that is in the record that the government relied on. There is no- Did you diagram this? Pardon? Did you diagram this? Did I? No, I didn't. I read the record several times. I hope that I have not misstated the record. If I have, I apologize. No, all that we really have that's concrete is that you've got the uncorroborated testimony of an informant, a co-conspirator. That's all we've got. Now, you know, it may be under state law that you need some corroboration. Under federal law, I don't think you need corroboration. You also have, Your Honor, the police investigation that was conducted, the bank records, the land transactions, the depositions. And you have the police officer's testimony saying that we have lodged these charges based on this evidence that we've gathered. And those exhibits, 12A, 12B, and 12C, seem to include the documents that support the charges that were lodged. The issue in this case is, is this a person where we are confident that the record is such that we should grant him adjustment of status? And the determination was that there was at least still enough question and enough evidence to weigh against the favorable exercise of discretion. So then the bottom line is the attorney general's discretion. And there has been no, the arguments that Mr. Fang raised before the board and in his petition for review, he's not shown a due process claim. He was, again, he was informed of the evidence that was against him. He was given an opportunity to cross-examine the government's witnesses. And he was given an opportunity to come forward with his own evidence to refute the government's reliance on him. In another area, in habeas, if there is absolutely no evidence that bottoms a conviction of a crime, and the petitioner in federal habeas can show that under Jackson v. Virginia, then that's a due process claim. But is there no evidence in this record? Well, that's what I've been asking you over and over again, and you've given me several different answers. But now you've given me 12A, 12B, and 12C to look at, and I will. But the issue is not whether there were transactions. The issue is whether Fang knew the money came from the People's Bank of China or other official government Chinese sources. That's what I'll be looking for. Thank you very much. Okay. Thank you, Your Honor. All right. If I may refer to Petitioner's opening brief on page 15 and 16, referenced in the Administrative Record at page 563 of the Immigration Test States, the crux of DHS's case in this Court's opinion is that you now have a co-defendant, referring to Mr. Wolf, who is not subject to cross-examination. And the judge goes on to state, and he has made claims that the respondent, referring to the Petitioner here, knew it was public funds, and he knew they were public funds, or he can make the witness available. I mean, I don't know. The judge at that point, based on the representations of the gun, said, it's not there. You're not going to win with what you have. I've gone on to Petitioner's opening brief, page 16, referenced in the Administrative Record, page 566. This is the judge. For this to be part of the record as it stands now, and the judge goes on, right now I have nothing in this record other than this individual, referring to Mr. Wolf, the alleged co-conspirator, to prove that Mr. Fang knew they were public funds. That's when the Immigration Judge said, without Mr. Wolf's testimony, the alleged co-conspirator, the lynchpin of this case, there's no government case. Mr. Fang is not guilty, so to speak, of all those alleged misdemeanors. Let me ask you, is there any other explanation how, whoa, a factory manager comes up with millions of dollars? They're business people. I'm not sure how they might have acquired it. I think the answer to that question is no, in the end. I mean, I spent a lot of time going through these things. He is a factory manager. He's dealing in millions of dollars and sending millions of dollars to Fang. Where the heck does Fang think that money comes from? I don't know that. It's the allegation Mr. Wolf is speculating on. But isn't that the problem? Because here we're not talking about a criminal conviction, proof beyond a reasonable doubt. We're talking about the exercise of discretion. And frankly, if I'm sitting in the IGA's shoes, I might well say, gee, this whole thing stinks. Not all criminals in China are necessarily being politically persecuted. Some of them really are criminals. And I've got enough here to make me think, you know, if Fang isn't himself a criminal, at least he's sleeping with dogs, and that's why he has fleas. And I'm not going to exercise discretion in his favor to adjust status. Why can't the IGA do that? I think that's not the authority of the IGA. If we look at the Immigration and Nationality Act. And we're giving them a pretty good break on this Convention Against Torture. You know, what's wrong with that? Well, there's a final order of removal that Mr. Fang has hanging over him. He can be removed to another country, so it's not the protection of asylum. But right now, he's safe. He's safe, right? Well, that's correct. But he can't have full status like he would if the judge did not ignore. Oh, yeah. It's a better deal. It's a better deal than being deported. It's a better deal than the other. Well, of course. And I don't know how many people who get the benefit of the Convention Against Torture are absolutely, you know, removed or kicked out of the country. I haven't seen any of those cases. So he got to go. In other words, the Attorney General says, well, you know, there's something fishy here. The Chinese government feels like it's been taken. And, yeah, we've got the testimony of this other co-conspirator. And we don't—we haven't gotten anything from Mr. Fang that's going to help us much. And, well, you know, I'll exercise my discretion, and I'll grant protection under the Convention Against Torture. So what's wrong with that? Let me ask what he does. Well, but, Your Honor, I think in reference to what Judge Villa was inquiring to federal counsel was, can you do that? And if I could cite to the court section from the Immigration Act. Can you do what? Cite to the citation 212A3C of the Act and also 237A4C of the Act. Those sections of the Immigration Act confers authority on the Secretary of State to certify that an alien present in the U.S. would have severe adverse foreign policy considerations. So if the Chinese Communist government thinks that Mr. Fang is such a bad dude, they ought to talk to diplomatic level and have the Secretary of State certify that Mr. Fang has an adverse public—severe adverse foreign policy consequences and deport him on that basis, a legitimate basis that's on the books rather than— I'm not going to ask anything that you're talking about now. No, Your Honor. I know your interests are rights, so go over it again. Right. Judge Villa asked about—and I think Judge Ferguson's question about, well, can't the judge exercise discretion? Can't I have suspicions? I said, no, you just can't go on suspicions. Well, he's not exercising discretion to remove him. He's exercising discretion to deny adjustment of status. Precisely. And Part 2, Justice Williams says, hey, you can't believe anything that those conversations said in Part 1. And if they judge, if the Attorney General feels so strongly that Mr. Fang should be removed from A3C— Your factual premise is what you just said, that is, that the IJ found you can't believe anything the Chinese communist agent said. We went through that exhaustively a few minutes ago, and he didn't—or she didn't find that. So don't give me that premise. Okay. Tell me what in the statute limits the exercise of discretion in denying adjustment of status. I think due process— Well, the statute— You told me that the regulations limit the exercise of discretion in denying adjustment of status. And then you start talking about Secretary of State. That's where I got lost. Okay. Just make the connection. Let me back up. The regulations required the immigration judges to make decisions on the record. And I know we have a disagreement about Part 2 and Part 1. I mean, that is not— I read about the record disagreement, not the findings. Well, that's my interpretation. You're right. The Secretary of State's function is to take care of this precise situation where there might be some suspicions. And we don't have evidence on either side, perhaps. The record is not clear. The BIA thought the record was not clear as to what the immigration judge would have done. So what you're saying is that on this record, it doesn't appear that the Chinese government is bothered about anything or upset about it enough to go to the Secretary of State. Is that what you're saying? Well, I don't know why they haven't gone to the Secretary of State. Well, they haven't said a thing. No, not exactly, Your Honor. I'm saying there's a longer buzz that people have overlooked that the highest level of our government, at the Secretary of State, is a non-delegable authority. This has to come from Hillary Clinton. Well, in this instance, we're talking about a law that's overlooked. And you haven't answered Judge Clifton's questions, which I would also like to hear. If Fang was dealing with Guo, a factory manager, and getting hundreds of millions of dollars or dozens of millions of dollars, where does Fang think it was coming from? I don't think the record is clear on that. But let me also point out that the translation of Mr. Guo's title, factory manager, may or may not be accurate in terms of how we perceive managers in our country as not being, say, the CEO or the chairman of the board. It could very well be a much higher authority, and people just use titles in a different way over there, Your Honor. But where do you think he was getting the money from? From the company he was managing? It could be. Or independent wealth? I don't know. The record's not clear. I don't think the government has established that Mr. Fang knew where the funds were. And also, Mr. Guo, when he testified, had not looked at his deposition from prior years, even though I believe the record reflects that the immigration judge had wanted the government lawyers to make sure that Mr. Guo knew where he was testifying to. He did. Thank you very much.
judges: Pregerson, Clifton, Bea